**E. H. OWEN, Appellant,**

**v.**

**Floyd HERRING, Receiver of Physicians Investment Corporation, Appellee.**

**No. 10709.**

Court of Civil Appeals of Texas.

Austin.

Dec. 9, 1959.

Harris, Anderson, Henley & Rhodes, Dallas, for appellant.

Byron Lockhart, Austin, for appellee.

GRAY, Justice.

The question presented is venue.

C. H. Langdeau, the substituted Receiver of Physicians Life and Accident Insurance Company of America, filed a second amended original petition in a pending suit which was filed by his predecessor receiver. The suit is against R. A. Stuart and his guardian R. A. Stuart, Jr., James T. Valentine, George S. McGhee and Guy B. Hamman to recover damages, jointly and severally, against them for the alleged:

"* * * fraudulent taking of funds by individual defendants who were officers, directors, majority stockholders and in control of the insurance company pursuant to a common design, agreement, scheme and conspiracy. Between April and September of 1955, the company had successfully sold its common stock to the public for prices ranging up to $14.20 per share and had a large amount of cash on hand. On September 30, 1955, the defendants and D. M. Parnell transferred $175,801.68 from the insurance company to the credit of their own personal accounts in Physicians Investment Corporation, an affiliated company which they also controlled. Later this money was used partly to retire personal notes which had been used as the 'capital contribution' of Hamman, McGhee, Valentine and Parnell, and partly to pay cash to Stuart and Valentine. Between October of 1955 and March of 1956, pursuant to their common scheme, design and conspiracy, defendants made further large diversions of company money, as more particularly set forth hereinafter. To cover up the taking of company money, defendants used the simple but effective expedient of altering the insurance company stock books and records to make it appear that the stock which had been sold to the public had actually been out of the stock of the defendants instead of out of the original stock of the insurance company."

The suit was filed and is pending in the 126th District Court of Travis County, the court in which the receivership is pending.

Floyd Herring, appointed by the above named court, Receiver of Physicians Investment Corporation intervened in the above cause and complained of the above named Stuart, Valentine, McGhee and Hamman and also of Dallas M. Parnell and E. H. Owen. He alleged that:

"The defendants Stuart, Valentine, McGhee, Hamman and Parnell, during

the years 1955 and 1956, and at the particular times and places described hereinafter in this petition, pursuant to a common purpose, combined, conspired, confederated and acted in concert in the commission of the various and sundry wrongful and illegal acts detailed hereinafter. * * *

"5. At some time or times in the year 1955, prior to March 25, 1955, at exact times and places which are unknown to Intervenor but which are well known to conspirators, conspirators, acting with a common purpose reached among and between themselves an agreement and understanding to perpetrate a stock swindle upon the public according to the following general plan. It was their intention to organize a life insurance company and to enrich themselves personally out of the proceeds of shares of its stock which they intended to be offered for sale to the public. They intended to evade the insurance laws designed for the protection of the public. They planned to contribute to the life company, on behalf of themselves, indirectly through an investment corporation, assets of only nominal value or pieces of paper of only apparent value in exchange for a substantial portion of the capital stock of the life company; to cause the remainder of the stock to be sold to the public for cash by means of false statements and concealments; and out of the cash thus received to remove surreptitiously and unlawfully an amount much greater than the amounts they had contributed while still keeping enough stock to make it appear that each one of them owned a substantial portion of the cash assets of the corporation contributed by the public. They intended to induce the public to invest in this enterprise and thus to contribute to their enrichment by means of whatever fraudulent concealments of material fact, distortions of the truth, and misrepresenta-

tions would be necessary to accomplish their purpose. They intended to conceal and confuse the means by which they had unjustly enriched themselves by a series of intricate corporate transactions and manipulations. They intended to remove the pieces of paper by redeeming the same with money contributed by the public. They intended to and agreed that they would remain in control of the corporation at all times in such fashion that its policies would be dictated by a small minority of the shareholders consisting only of members of their own group. They intended to cover all their activities with the cloak of apparent legality, in such fashion that it would be made to appear to the public, to the creditors of the company, and to the appropriate officials of the State of Texas that their operation was legitimate, bona fide business rather than a fraudulent, evil, and unlawful scheme.

"6. As the first step in their conspiracy, the conspirators agreed that they would attempt to organize, to retain the apparent ownership of, and to control an investment company to be known either as Physicians Investment Corporation or Physicians Investment Company. Accordingly, during the first three months of 1955, they solicited subscriptions from the public and they accumulated from the public the sum of $183,080. In order to induce this investment from the public, they caused to be represented falsely to each and every person from whom a stock subscription was solicited that all persons, including the conspirators, to whom stock was to be issued by the proposed corporation would receive stock at the rate of one share of stock for each dollar of money or its equivalent value in property reasonably worth the sum at which it would be taken by the corporation, in such fashion that all subscribers and contributors to the

capital stock of such corporation would be treated exactly alike."

Then followed allegations of acts and the intent of the above named defendants and that:

"As the second step in their operation, the conspirators determined to cause the funds of the investment company to be used to form a life insurance company. They determined to cause the stock of the life insurance company to be sold to the public, through false representations and concealments, at prices per share many times greater than the amount per share they would have contributed or apparently contributed to such company; and they determined to take a substantial part of the money to be received from the public through the sale of the life company's stock to pay to themselves and to retire and redeem the pieces of paper which they had contributed to the investment company as their contribution thereto. All the conspirators knew, however, that the pieces of paper they had contributed to the investment company as their capital contribution were not assets of the character and quality which life insurance companies under the laws of Texas were permitted to own, and they believed that the Board of Insurance Commissioners which supervises and examines insurance companies in Texas might detect the falsity in the value of this paper. They determined, therefore, to cause these pieces of paper to be substituted continuously with cash borrowed for such purpose and as minimum risk to themselves until such time as they could sell enough stock at inflated prices to the public to create a fund large enough to remove enough money to redeem this paper. This scheme of substitution is what is commonly known among charlatans as a 'kiting scheme.' They intended to conceal the facts concerning this arrangement from the Insurance Board at all times. In pursuance of his plan, therefore, on or about March 28, 1955, the conspirators caused the investment company to issue and deliver to the Empire State Bank of Dallas its promissory note dated March 28, 1955, in the original principal sum of $225,000, payable in 60 days. They caused the investment company to secure this note with a pledge to the bank of the four mortgage notes and deeds of trust which had been created by the conspirators as their contribution to the capital of the investment company. Hamman, Parnell and McGhee further endorsed this $225,000 note, personally guaranteeing its payment to the Empire State Bank in order to obtain the loan sought. Hamman and Parnell received this money for the investment company, but they immediately took it out of the investment company and placed it in a separate bank account to the account of Physicians Life and Accident Insurance Company, which had not yet been organized. In addition to the money borrowed from the bank, Parnell and Hamman also removed additional funds of the investment company and caused the same to be deposited to the account of the life company, in such fashion that a total of $406,000 was thus abstracted by them. From that day until this, this money has never been returned or repaid, nor has any other thing of value ever moved from the life company to the investment company in its place, all to the damage of the investment company and this intervenor in the sum of $406,000 plus interest at the rate of 6% per annum from March 28, 1955."

It was then alleged that after the charter was granted to the Life Company the conspirators, or the board of directors of that company, caused it to issue and distribute 408,070 shares of its capital stock and instead of it being issued to the Investment Corporation such stock was issued to

various individuals including a total of 226,-000 shares to the above named McGhee and Parnell and their respective nominees and to Stuart, Hamman and Valentine. And further that:

"In addition they caused 50,000 shares to be issued to the defendant E. H. Owen."

It was then alleged that:

"The defendant E. H. Owen was a party to the agreement described in paragraph 5 hereinbefore * * *.

"Pursuant to this agreement and understanding, the defendant Owen, acting in concert with the conspirators, participated actively in the organization of each of the two companies, and during the life of each of the companies he was an officer in, a director in, a member of the executive board of, and an active participant in the affairs of, the life company. He consented, agreed to, and assisted in furthering the transaction described in Paragraphs 15, 17, 19, 20, and 22 of this petition, by which the investment company was divested of its assets and the shares of stock in the life company were issued to various and sundry persons other than to Physicians Investment Corporation. He personally assisted in distributing the fraudulent and misleading prospectus described in paragraph 21 to an unsuspecting public, at a time when he knew and should have known that the allegations of fact, hereinbefore detailed, set forth therein were materially incomplete, misleading, false, and fraudulent. He personally sold and assisted in the sale of shares of the life company stock to numerous members of the public. In each instance he demanded and received from the company a commission on the sale of such stock. At the present time the defendant Owen claims title to approximately 111,000 shares of stock of the life company."

A money judgment against Stuart, Parnell, Hamman, Valentine, McGhee and Owen, jointly and severally, was prayed for, and:

"That title to all of those certificates of stock in the life company held by the cross-defendant Langdeau, as set forth in paragraph 35 of this petition be declared to be in Intervenor, and that this court order such cross-defendant to deliver such certificates to this intervenor; * * *."

And further:

"In the alternative to all of the relief sought in this paragraph II of this prayer, and pursuant to paragraph 20 of this petition, that a trust be ordered impressed, to the extent of $406,000 against all of the assets in Langdeau's possession, and that judgment be granted to Intervenor against said Langdeau, Stuart, Parnell, Hamman, Valentine, McGhee and Owen jointly and severally in the sum of $406,000 plus interest at 6% from March 28, 1955; * * *."

As going concerns both the Life Company and the Investment Corporation were domiciled in Dallas County and the residence of each of the individual defendants was alleged to be in counties other than Travis.

E. H. Owen filed his plea of privilege to be sued in Dallas County, the county of his residence. The plea was duly controverted and, at a nonjury trial, it was overruled.

There is no controversy here as to venue of Receiver Langdeau's suit against the above named defendants and none as to venue of Receiver Herring's intervention and suit against Langdeau. Although E. H. Owen is mentioned in Langdeau's pleadings he was not a party defendant in that cause and venue as to him in this cause is controlled by the general venue statute. Nelson v. Thompson, Tex.Civ.App., 64 S.W.2d

373. Er. dism., Hemphill v. Jandrew, Tex. Civ.App., 69 S.W.2d 195. Er. dism.

Art. 2310, Vernon's Ann.Civ.St., provides that when property within this State has been placed in the charge of a receiver such receiver may sue or be sued in his official capacity in any court of the State having jurisdiction of the cause of action without leave of the court appointing him.

■ Exception 4 of Art. 1995, Vernon's Ann.Civ.St., in part, provides:

"Defendants in different counties. —If two or more defendants reside in different counties, suit may be brought in any county where one of the defendants resides."

In Stockyards Nat. Bank v. Maples, 127 Tex. 633, 95 S.W.2d 1300, 1303, the requirements to sustain venue under exception 4 supra are stated. These are: (1) there must be alleged a joint cause of action against the resident and nonresident defendant, or one so intimately connected that the two may be joined under the rule to avoid a multiplicity of suits; (2) it must be proved by affirmative evidence that one of the defendants is a resident of the county where the suit is pending; (3) there must be proved a cause of action against the resident defendant, and (4) the proof must show the nature of the cause of action, that is, that the suit is against two or more defendants properly joined.

Element (4) is sufficiently proved by the allegations of the petition and evidence as to the merits of the cause of action alleged against the nonresident defendant should be given no effect in determining the issue of venue.

In the course of its opinion the court said:

"We express no opinion as to the correctness of the rule requiring the plaintiff on the hearing of the plea of privilege to make proof that he has a cause of action against the resident defendant or as to the soundness of the reasons given in support of it. By its positive announcement in an opinion adopted by the Supreme Court many years ago and the many decisions of the Courts of Civil Appeals approving and following that opinion, the rule has become so well established as a part of the procedural law of the state that it should not be changed without legislative action. The cause of action proven must be the one pleaded by the plaintiff. Gholson v. Thompson, Tex. Civ.App., 298 S.W. 318. * * *

"Proof by the plaintiff that he has a cause of action against the resident defendant is relevant to the issue of venue, in that the plaintiff in making such proof conclusively shows his good faith in the selection of the venue; but proof by the plaintiff that he has a cause of action against the nonresident defendant has no relevancy to the issue of venue."

The evidence shows that the Receiver Langdeau individually has been a resident of Austin in Travis County for fifteen years or more. He was appointed successor Receiver of the Life Company June 10, 1958. Prior to going into receivership the Life Company maintained its principal office in Dallas County. This office was closed about the middle of 1958, the services of the employees were discontinued and the books and records of the company were brought to Austin where they are now. The home office building of the Life Company in Dallas has been sold by the Receiver Langdeau and since the middle of 1958 no business of the Life Company has been conducted in Dallas but all such business has been conducted out of the Receiver's Austin office.

The intervention (suit against Receiver Langdeau and appellant Owen) was filed February 6, 1959 and was against Receiver Langdeau in his official capacity. His individual residence was in Travis County where all of his official acts as receiver are performed and for the purpose of determining venue of this cause it must be

said he is a resident of Travis County. American Rio Grande Land & Irrigation Co. v. Karle, Tex.Civ.App., 237 S.W. 358. Er. dism.

An auditor who testified from the books and records of the Life Company and the Investment Corporation said that $406,000 cash belonging to the Investment Corporation was transferred to the Life Company. This amount consisted of $225,000 borrowed from the Empire State Bank, $50,850, the value of stock contributed by appellant Owen, and cash received from subscribers of stock. He said nothing of value was returned to the Investment Corporation in exchange for the $406,000, that being the total capital of the Life Company.

Also there was in evidence agreements for the promotion of the two companies which were signed by the individual defendants wherein by a voting trust agreement the parties agreed to vote their stock at all times in the same manner for or against the same propositions.

■ The pleading of the intervenor disputes Receiver Langdeau's right and title to assets of the Life Company in his charge and asserts such right and title to be in himself. There is no dispute in the record of the evidence supra and it is sufficient to prove a prima facie cause of action against Receiver Langdeau.

The allegations of the Intervenor's pleading show the nature of the alleged cause of action and the over-all relief prayed for by the Intervenor against the individual defendants is substantially the same as that prayed for by the Receiver Langdeau. Each is asserting that the same property and the same cause of action constitutes assets belonging to him in his official capacity. Further the relief prayed for by the Intervenor against the Receiver Langdeau and against appellant Owen arose out of the same transactions and occurrences and their joinder will prevent circuity of action and the multiplicity of suits. 32 Tex.Jur. p.

38, § 23. Rule 40, Texas Rules of Civil Procedure.

The case of Stockyards Nat. Bank v. Maples supra has been often cited and followed. The correctness of the holding has not been questioned and, since it decides, the issue of venue before us, we deem it not necessary to cite additional authorities.

The judgment of the trial court is affirmed.

Affirmed.